UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MIDWEST MEMORIAL GROUP, LLC,                          :
                                                      :
                              Plaintiff,              :
                - against -                           :
                                                      :
INTERNATIONAL FUND SERVICES                           :
(IRELAND) LIMITED,                                    :
                                                      :
                              Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: October 17, 2011 |

10 Civ. 8660 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Midwest Memorial Group, LLC ("Plaintiff") brings this action for damages against Defendant International Fund Services (Ireland) Limited ("IFS") alleging four causes of action: (1) aiding and abetting conversion; (2) negligence; (3) aiding and abetting fraud; and (4) civil conspiracy, in connection with a criminal scheme to convert trust fund assets of various cemeteries in Michigan. IFS moves to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) arguing that all of Plaintiff's claims are time barred. In the alternative, Defendant argues that Plaintiff also fails to state claims for relief under New York law. For the reasons discussed below, the Court finds that the Plaintiff's claims are time barred and GRANTS the Defendant's motion to dismiss.

I.      BACKGROUND

In 2003, Mark Singer, who was then a financial advisor employed by Deutsche Bank, met Craig Bush, a Michigan attorney and businessman who owned various cemeteries (the "Cemeteries") in Michigan. (Compl. ¶ 22.) Michigan law requires a cemetery to maintain trust accounts to provide for the care and upkeep of graves in perpetuity, as well as to fund the

1

purchase price of headstones, monuments, and mausoleums.  (Id. ¶¶ 24-25.)  These trust funds

(the "Cemetery Trust Funds") totaled approximately $68 million in the fall of 2003.  (Id. ¶ 25.)

On Singer's advice, Bush formed a shell company, Summerfield LLC ("Summerfield"), to serve

as the "investment vehicle" for the Cemetery Trust Funds.  (Id. ¶ 26.)  Summerfield then

invested the Cemetery Trust Funds in various hedge funds (the "Topiary Funds") sponsored by

Deutsche Bank and administered by IFS.  As fund administrator, IFS was responsible for

maintaining all financial and accounting books and records, among other things.  (Id. ¶ 15.)

Bush, who was actively trying to sell the Cemeteries for three years, found a prospective

buyer in Clayton Smart.  Plaintiff alleges that Singer and Smart devised a plan to transfer

ownership to Smart and to use the Cemetery Trust Funds to pay Bush.  (Id. ¶ 28.)  First, Smart

would get a personal loan to convince Bush that he had the resources to purchase the Cemeteries.

Second, having satisfied Bush by obtaining funds, Bush would then transfer control of the

Cemetery Trust Funds to Smart.  Third, after Smart controlled the Funds, he would transfer their

assets into his own name.  Lastly, Smart would pay Bush for the Cemeteries directly from the

Cemetery Trust Funds "and loot the remainder."  (Id. ¶ 29.)

On July 28, 2004, Singer, who was now at Smith Barney, issued term sheets for two

loans totaling $31.5 million from Smith Barney.  (Id. ¶ 34.)  The term sheets showed the

collateral for these loans was to be Smart's alleged interest in the Topiary Funds, but these assets

were in the name of Summerfield, and administered by IFS.  Smart then gave Bush the term

sheets for the loans from Smith Barney.  On August 19, 2004, Bush and Smart signed a Purchase

Agreement for the Cemeteries.  Smart was to pay $31 million and assume a $15 million debt that

Bush had incurred when he purchased the Cemeteries in 2000.  (Id. ¶ 37.)  Smart was to pay the

purchase price following a "closing date" but was entitled to operate the Cemeteries in the "ordinary course" before Bush received any funds. (Id. ¶ 38.)  The Purchase Agreement restricted Smart from conducting investment transactions "without prior regulatory approval." (Id.)

To finalize Smart's purchase of the Cemeteries, on August 22, 2004, Smart faxed IFS a request to move Summerfield's holdings in the Topiary Funds to a Smith Barney account in Smart's name. (Id. ¶ 43.)  IFS did not recognize Smart's name and so it initially declined this request. (Id.)  On August 26, 2004, Bush directed IFS to grant control to Smart, and IFS acknowledged the change in signatories for the Fund. (Id. ¶ 44.)  On August 30, 2004, Smart again faxed IFS to request that IFS transfer Summerfield's interest in the Topiary Funds to a company in which Smart owned a 95 percent interest. (Id. ¶ 45.)

These transfers were to be approved as of September 30, 2004, but a transaction as of that date would give the lie to Smart's assertion that he had an interest in the Topiary Funds as of July 24, 2004.  Accordingly, Singer and Smart then "worked with IFS to 'back date' the transfers and issue false account statements that stated Smart owned the funds as of June 30, 2004," even though IFS had previously issued statements to Summerfield showing Summerfield owned the interest in the Topiary Funds through July 2004. (Id. ¶¶ 46-47.)  Singer faxed this backdated account statement to Smith Barney on September 16, 2004, and the next day IFS faxed a letter agreement to Smith Barney confirming that Smart owned an interest in the Topiary Funds. (Id. ¶ 50.)  After receiving the letter agreement from IFS on September 17, Smith Barney issued its loan to Smart that same day. (Id. ¶ 51.)

According to Plaintiff, IFS's backdated account statement "was crucial to Smith Barney actually funding the loan, which, in turn, was crucial to the entire Scheme." (Id. ¶ 49.) Through the backdated statement, Smart "appeared to have an ownership interest in the Summerfield accounts at a time when he did not," which in turn made Smart "appear eligible to purchase the Cemeteries so he could obtain funding from Smith Barney and thereby gain access to the Trust Funds." (Id. ¶ 48.)

Plaintiff alleges that after the Cemetery Purchase was final, Smart and Singer "began moving funds in and out of the Smith Barney accounts in a swirl of fraudulent activity," while simultaneously creating a false paper trail to hide their conversion of the Cemetery Trust Funds. (Id. ¶¶ 53-55.) Authorities in Michigan began an investigation in 2006 and filed Conservatorship proceedings on December 18, 2006 alleging that more than $60 million in Cemetery Trust Funds were unaccounted for. (Id. ¶ 56.) Criminal proceedings are currently pending against Smart in both Tennessee and Michigan.

Plaintiff purchased the Cemeteries from the Michigan conservator and filed suit in Michigan state court[1] (the "Michigan Action") on January 28, 2010 against IFS, Singer, Smart, Smith Barney, and others. On September 7 and October 21, 2010, the Michigan court issued two opinions finding that the court lacked personal jurisdiction over IFS. (Id. ¶ 62.) On November

---

[1] The complaint in the Michigan state action is annexed to the Declaration of Geoffrey S. Berman ("Berman Decl.") as Exhibit A. The Court may consider the facts alleged in the Michigan Action, as Plaintiff had knowledge of them and relied upon them in drafting the complaint in this case. See Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991).

16, 2010, Plaintiff filed its Complaint in this action.  On November 17, 2010, IFS was dismissed

from the Michigan Action for lack of personal jurisdiction.[2]  (Def. Mem. at 6.)

Plaintiff and IFS entered into a statute of limitations tolling agreement that applied to

claims existing as of September 7, 2007.  The tolling agreement prohibited Plaintiff from filing

claims relating to the Cemetery Trust Funds while the agreement was in effect.  The agreement

terminated on January 2, 2010.  (Compl. ¶ 17.)

## II.    DISCUSSION

### A.  Legal Standard for a Motion to Dismiss

When considering a motion to dismiss under Fed.R.Civ.P. 12(b) (6), the Court assumes

all facts alleged in the complaint to be true, and draws all reasonable inferences in favor of the

plaintiff.  Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Nevertheless, simple chanting of the elements of a cause of action, "supported by mere

conclusory statements, do not suffice. . . .  While legal conclusions can provide the framework of

a complaint, they must be supported by factual allegations."  Ashcroft v. Iqbal, __ U.S.__, 129

S.Ct. 1937, 1949–50, (2009).  To avoid dismissal, the complaint must contain "enough facts to

state a claim to relief that is plausible on its face," that is to say, facts that "nudge [ ] [the

plaintiff's] claims across the line from conceivable to plausible. . . ."  Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007).

The parties agree that the Court should apply the New York statute of limitations, as well

as New York substantive law in this case.  The parties have not asserted any conflict with

Michigan law that would prevent this Court from applying New York law.

---

[2] The parties do not dispute that the Court has personal jurisdiction over IFS in this action.

### B.  Statute of Limitations

Defendant argues that all four of Plaintiff's claims are time barred.  Plaintiff contends that they are timely, and argues in the alternative that the Court should apply New York's tolling statute, CPLR § 205(a).

### 1.  Aiding and Abetting Conversion and Negligence

New York applies a three-year statute of limitations for conversion and negligence actions.  N.Y. CPLR §§ 214(3), 214(4).  The Court must first address when these two claims accrued.  Plaintiff argues the relevant date is when the funds were misappropriated, which continued until Michigan authorities discovered Smart and Singer's fraud in 2006.  (Compl. ¶¶ 55-56.)  IFS argues these claims accrued when IFS backdated the account statements, and that New York and Michigan do not recognize a "discovery rule" for negligence and conversion actions.

Plaintiff is correct that the causes of action for both conversion and negligence first accrued when the Cemetery Trust Funds sustained an injury.  See, e.g., Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 292 (N.Y. 1993) ("[A]s a general proposition, a tort cause of action cannot accrue until an injury is sustained . . . [and] accrual occurs when the claim becomes enforceable, i.e., when all the elements of the tort can be truthfully alleged in a complaint").  New York does not apply a "discovery rule" to extend accrual until a plaintiff discovers that injury.  See id.  Thus, the two causes of action for aiding and abetting conversion and negligence accrued when Smart and Singer began to misappropriate the Cemetery Trust Funds, and not when IFS allegedly backdated the account information.  See Songbyrd, Inc. v. Estate of Grossman, 206 F.3d 172, 182 (2d Cir. 2000) (cause of action for conversion accrues when the

defendant begins "commercially exploiting" plaintiff's property as its own (citing <u>Sporn v. MCA Records, Inc.</u>, 448 N.E.2d 1324 (N.Y. 1983)).

The Complaint alleges that the conversion of Cemetery Trust Funds—and thus Plaintiff's actual injury—did not begin until Smith Barney issued the loan to Smart, thus enabling Smart to complete his purchase of the Cemeteries from Bush.  According to the Complaint, "[o]nce the [Cemetery purchase] transaction was final, Smart and Singer were then able to accomplish their goal of stealing the over $60 million in Cemetery Trust Funds.  Smart and Singer began moving funds in and out of the Smith Barney accounts in a swirl of fraudulent activity."  (Compl. ¶¶ 52-53.)  The Complaint does not indicate when that purchase was finalized, but the Michigan Complaint alleges that the bulk of fraudulent transfers of Cemetery Trust Funds occurred during September 2004 with the latest transfer occurring on January 4, 2005.[3]  (Berman Decl., Ex. A ¶72, 78.)  Thus, even if Plaintiff's aiding and abetting conversion and negligence causes of action did not accrue until the latest fraudulent transaction was complete on January 4, 2005, after the parties' tolling agreement expired on January 2, 2010, the statute of limitations would have run by May 2010 at the latest—six months before Plaintiff filed this action.[4]  Plaintiff's aiding and abetting conversion and negligence claims are therefore time barred.

---

[3] The Michigan Complaint alleges that the Cemetery Trust Funds were first misappropriated on August 30, 2004, (Berman Decl. Ex. A ¶ 78.), before IFS allegedly backdated the account statements to show that Smart owned Topiary Funds earlier than he in fact did.  The Court need not resolve this fact issue on a motion to dismiss, it is not necessary to do so; the last fraudulent transaction date alleged in the Michigan Complaint leads to the same result for statute of limitations purposes.

[4] Assuming the most generous scenario for Plaintiff, if these claims accrued on January 4, 2005, two years and eight months would have run on the limitations period between that date and September 7, 2007, when the parties' tolling agreement took effect.  The agreement expired on January 2, 2010, leaving approximately four months on the limitations period.  Thus, the three-year limitations period on these claims was exhausted as of May, 2010.  The lawsuit was commenced on November 16, 2010, six months late.

2.   Aiding and Abetting Fraud and Civil Conspiracy[5]

In an action for fraud, the limitations period is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. CPLR § 213(8); Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (applying six-year statute of limitations to both fraud and aiding and abetting fraud claims).  The parties agree, however, that New York allows a six-year limitations period "only when there would be no injury but for the fraud" and not "where the allegations of fraud are only incidental to another cause of action."  See Grill v. Phillip Morris USA, Inc., 653 F. Supp. 2d 481, 487 (S.D.N.Y. 2009) (holding that six-year limitations period to fraud claim did not apply where plaintiff's lung cancer "would have resulted from Defendant's negligent failure to warn [of the hazards of smoking] even absent any fraud" (citing N.Y. Seven-Up Bottling Co. v. Dow Chem. Co., 466 N.Y.S.2d 478 (2d Dep't 1983)).  IFS argues that Plaintiff's claims for aiding and abetting fraud and civil conspiracy are also time barred because they are "merely incidental" to Plaintiff's conversion and negligence claims.  (Def. Mem. at 10.)  Plaintiff contends that its fraud and conspiracy claims are not merely incidental because the Cemetery Trust Funds "would not have suffered the injuries but for the underlying fraud scheme, which IFS knowingly assisted." (Pl. Mem. at 9.)

---

[5] Plaintiff conceded at oral argument that if it cannot sustain its fraud count, its claim for civil conspiracy fails, as New York does not recognize an independent tort of civil conspiracy.  (Oral Argument Tr., Oct. 12, 2011, at 13:14-15.)  See also, Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006); Alexander & Alexander of New York, Inc. v. Fritzen, 503 N.E.2d 102 (N.Y. 1986) (affirming dismissal of conspiracy claim where plaintiff failed to plead interference with prospective economic advantage, stating "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort").

To determine whether a fraud claim is "merely incidental" to other claims in an action, courts have looked to the "gravamen," or essence, of a plaintiff's claims. See Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d. 387, (S.D.N.Y. 2010) (holding fraud claim was incidental and consequently time barred where "the gravamen of plaintiff's claims is that [one of the defendants] stole money from [plaintiff], not that he lied about doing so"); Fisher v. APP Pharm., LLC, No. 08 Civ. 11047, 2011 WL 812277 (BSJ), at *4 (S.D.N.Y. Mar. 1, 2011) (dismissing fraud claim as time barred where defendants' alleged fraud "consisted of their failure to disclose the side effects of herapin" and where such allegations "were only incidental to Plaintiff's cause of action sounding in products liability").

Judge Kaplan's decision in Marketxt is particularly helpful in analyzing when fraud claims are merely incidental as opposed to being of the essence. In Marketxt, plaintiff-debtor alleged that defendants knowingly assisted plaintiff's CEO in devising and implementing a fraudulent scheme to convert certain plaintiff's stock through two transactions. 693 F. Supp. 2d at 388. Plaintiff brought four claims with respect to each transaction: aiding and abetting fraud; aiding and abetting breach of fiduciary duty; aiding and abetting conversion; and conspiracy to effectuate a fraudulent conveyance. Id. at 392. Defendants moved to dismiss, arguing that plaintiff's fraud claims were "merely incidental to its conversion claims and that the shorter statute of limitations for conversion bars the plaintiff from recovering on its aiding and abetting theories." Id.

Judge Kaplan observed that "[t]he fundamental question with respect to plaintiff's aiding and abetting claims is whether the underlying conduct is properly characterized as fraud or conversion for purposes of statutes of limitation." Id. at 393. "This essentially is a question of characterization—are the plaintiff's allegations of fraud independently viable or do they merely

follow-on the conversion claim?" Id. at 394-95.  Although different courts have characterized

the analysis in different ways, see id. at 395 (citing cases), all follow "the premise that, on the

facts as pleaded in the complaint, a fraud claim must have meaning and force independent of the

plaintiff's other claims in order for the plaintiff properly to benefit from its longer statute of

limitations." Id.

Judge Kaplan found that the "gravamen of plaintiff's amended complaint is that the

defendants helped [plaintiff's CEO] steal assets properly belonging to [plaintiff]." Id. at 396.

Plaintiff's CEO's fraudulent conduct was in furtherance of that scheme, "and this conduct did

not cause cognizable damage to [plaintiff] independent of that conversion." Id.  Judge Kaplan

concluded that it was the "theft itself—not the deception that was in service to, and logical

incident of, that theft—that form[ed] the basis for all of plaintiff's claims." Id.

As in Marketxt, Plaintiff's claims center on allegations of theft rather than deception.

Indeed, Plaintiff alleges "[t]his is a modern-day case of grave robbery." (Compl. ¶ 1.)  IFS's

assistance was essential to Smart and Singer's scheme to "steal" $60 million.  (Id.)  References

to "looting" appear throughout the Complaint.  (Compl. ¶¶ 1, 3, 4, 5, 8, 9, 29, 54.)  Plaintiff

alleges the scheme had three stages:  acquisition of control, looting the funds, and covering up.

(Id. ¶¶ 5-10.)  Singer and Smart, with the help of IRS, "succeeded in stealing no less than $60

million."  (Id. ¶ 11.)

Plaintiff here does not allege that it suffered damages distinct from the conversions,

suggesting again that "[b]ut for the alleged conversions, plaintiff could not make out an

underlying primary violation on which to base its allegations of secondary liability regarding the

defendant[]." Marketxt, 693 F. Supp. 2d at 396.  Moreover, as IFS points out, and as the Court

observes, Plaintiff did not include any fraud or civil conspiracy claims against IFS in its earlier

Michigan action, based on the same facts alleged here, which tends to suggest that Plaintiff now seeks to avoid the shorter limitations period for its negligence and conversion claims.  (Def. Mem. at 12 n.7; Reply Mem. at 3.)  Time barred claims cannot be revitalized by tricks of pleading.  See Gold Sun Shipping Ltd. v. Ionian Trans, Inc., 666 N.Y.S.2d 677, 678 (N.Y. App. Div. 2d Dep't 1997) (affirming dismissal of fraud claim as time barred where "the cause of action alleging fraud was merely incidental to the conversion cause of action, and the only purpose it serves in the complaint is to avoid the Statute of Limitations."); Powers Mercantile Corp. v. Feinberg, 490 N.Y.S.2d 190, 192 (N.Y. App. Div. 1st Dep't 1985) (affirming dismissal of fraud claim as ancillary to time barred misappropriation claim, stating that "courts will not apply the fraud statute of limitations if the fraud allegation is only incidental to the claim asserted; otherwise fraud would be used as a means to litigate stale claims").  Accordingly, the six-year statute of limitations does not apply to Plaintiff's claim for aiding and abetting fraud. Count Three of Plaintiff's Complaint is therefore dismissed as time barred.

There is no independent tort to provide a basis for liability on Plaintiff's conspiracy claim, and Count Four must be dismissed.  See Fritzen, 503 N.E.2d at 103; see also fn. 5 supra.

### C.  Applicability of CPLR §205(a)

As previously discussed, the parties entered into a tolling agreement which covered the period from September 7, 2007 to January 2, 2010.  As of the January date, Plaintiff still had approximately four months left on the claims subject to the three-year statute.  On January 28, 2010, Plaintiff commenced its action in Michigan.  When Michigan court indicated that it would dismiss the complaint against IFS for want of personal jurisdiction, Plaintiff promptly commenced this action against IFS here in New York, where personal jurisdiction is conceded. Plaintiff claims the protection—or benefit—of the tolling provision of CPLR § 205(a), which

provides that if an action is timely commenced, but thereafter terminated, a plaintiff may bring a new action within six months.[6]

But there are limitations.  A number of courts have held that actions commenced outside of New York are not considered "prior actions" for purposes of triggering § 205(a).  See DiPaolo Mach. Works, Ltd. v. Prestige Equip. Corp., No. 96 Civ. 3195 (SJ), 1998 WL 205386, at *3 (E.D.N.Y. Apr. 24, 1998) (citing Baker v. Commercial Travelers Mut. Accident Assoc., 161 N.Y.S. 2d 332 (4th Dep't 1957), *appeal dismissed*, 150 N.E.2d 233 (N.Y. 1958)); Talarico v. Crimmins Contr. Co., Inc., No. 94 Civ. 0420 (RPP), 1995 WL 422034, at *2 (S.D.N.Y. July 18, 1995); Popkin v. Nat'l Ben. Life Ins. Co., 711 F. Supp. 1194, 1198 (S.D.N.Y. 1989) ("It may be that the policy underlying [CPLR § 205(a)] justifies extending its reach to actions commenced outside New York.  Yet the merits of such an extension of the law are for the New York legislature to address, not for this Court.").

If, contrary to these cases, the Court were to apply CPLR § 205(a), Plaintiff still would not prevail.  IFS's dismissal in Michigan was for want of jurisdiction.  The tolling provisions are not applicable where a prior action against the same defendant has been terminated for lack of personal jurisdiction.  See N.Y. CPLR§ 205(a), fn. 6 supra.

---

[6] The statute provides in relevant part:

> New action by plaintiff.  If an action is timely commenced and is terminated in any other manner than by . . . a failure to obtain personal jurisdiction over the defendant, . . . the plaintiff . . . may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

N.Y. CPLR § 205(a).

Plaintiff's reliance on Lehman Bros. v. Hughes Hubbard & Reed, L.L.P., 707 N.E.2d 433 (N.Y. 1998), is misplaced.  In that case, plaintiff had filed a legal malpractice action against defendant in Texas state court.  707 N.E.2d at 433.  After that action was dismissed for lack of personal jurisdiction "based upon the defendant's lack of minimum Texas contacts," id., plaintiff appealed to the Texas courts and, ultimately, the United States Supreme Court.  Id.  Those appeals were unsuccessful.  Id.  Plaintiff then filed its New York action against the same defendant on the same claim, over three years after the Texas trial court dismissed the prior action.  Id.  The New York Supreme Court granted defendant's motion to dismiss and held that, "because plaintiff's Texas action was dismissed for want of personal jurisdiction, the CPLR 205(a) tolling provision was unavailable."  Id.  The court also held that the tolling provision did not apply "because the first action was brought in a sister State."  Id.  The Appellate Division unanimously affirmed and concluded that plaintiff's Texas action "was not a 'prior action' within the meaning of CPLR 205(a)."  Lehman Bros., Inc. v. Hughes Hubbard & Reed, L.L.P., 665 N.Y.S.2d 900, 900 (N.Y. App. Div. 1st Dep't 1997).  In affirming, the Court of Appeals "assume[d], without deciding, the applicability of CPLR 205(a)" and reaffirmed that a party cannot extend the six-month tolling period under § 205(a) by pursuing discretionary appellate review.  707 N.E.2d at 433.  That issue is not present in this case, and Lehman otherwise confirms that § 205(a) does not apply where a prior action was commenced in a sister state and was dismissed for lack of personal jurisdiction.

Accordingly, § 205(a) does not apply in this case, and Plaintiff's claims for aiding and abetting conversion and negligence are therefore time barred.  As all of Plaintiff's claims are dismissed as untimely, the Court need not address Defendant's remaining arguments regarding Plaintiff's failure to state a claim.

## CONCLUSION

For the foregoing reasons, IFS's motion to dismiss is GRANTED.  The Clerk is directed to enter

judgment and terminate this case.

Dated:  New York, New York
        October 17, 2011

                                            SO ORDERED

                                            _____
                                            PAUL A. CROTTY

                                            United States District Judge

14